# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 10cr3089 BTM |
|---|---|
| Plaintiff, | **ORDER DENYING MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT** |
| v. | |
| ELTON WILSON (1), REGINALD GLENN LEWIS (2), DEVIN MATSON (3), | |
| Defendants. | |

Defendants have filed a motion to dismiss the indictment for outrageous government conduct. For the reasons discussed below, Defendants' motion is **DENIED**.

## I. BACKGROUND

The precise facts of this case are not entirely clear. The facts set forth in this section are facts gleaned by the Court from oral argument of counsel and the parties' papers.

In or about July, 2010, a source of information working with the confidential informant ("CI") in this case made initial contact with defendant Matson and inquired whether Matson was aware of someone who would be interested in a home-invasion robbery. The source of information then set up a meeting with Matson and the CI.

On July 27, 2010, defendant Matson met with the CI, and they discussed Matson's potential involvement in a home invasion style robbery of a drug stash house. Matson

mentioned that his cousin would come along and would bring a "bang." Matson and the CI agreed to set up a meeting the following day with the CI's friend (an ATF undercover agent ("UC") posing as a disgruntled drug courier).

On July 28, 2010, Matson met with both the CI and UC and they discussed some details of how the robbery would take place. Matson requested that they meet again later in the day so his cousin could be briefed about the robbery. At the subsequent meeting, Matson as well as Wilson met with the CI and UC. The UC told Matson and Wison that on Friday, July 30, he would be notified regarding the location of the stash house where he was to pick up 6 to 7 kilograms of cocaine. The UC also explained that in the past, there had always been two guards, one of whom was armed, protecting the cocaine, and that there was usually around 40-42 additional kilograms of cocaine at the location. It was agreed that Wilson and Matson would perform the robbery with a third person and that the three of them would meet with the CI and UC one more time on July 30.

On July 30, 2010, Wilson, Matson, and Lewis met with the CI and UC, and details of the robbery were discussed. At the end of the meeting, the three defendants were arrested. A search of the vehicle they arrived in resulted in the seizure of a .40 semi-automatic pistol, a 9mm semi-automatic pistol, and two loaded magazines. Also discovered in the trunk of the car were multiple pairs of baseball batting gloves, a ski mask, and a "Friday the 13th" mask.

On August 4, 2010, a grand jury returned an indictment charging Defendants with knowingly and intentionally conspiring to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. On January 11, 2012, the grand jury returned a Superseding Indictment adding counts for conspiracy to affect commerce by robbery and extortion (18 U.S.C. § 1951(a)), possession of a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)(1)(A)(i)), aiding and abetting (18 U.S.C. § 2), felon in possession of a firearm and ammunition (18 U.S.C. §§ 922(g)(1) and 924(a)(2)), and criminal forfeiture (18 U.S.C. §§ 924(d), 281(a)(1)(C), and 28 U.S.C. § 2461(c)).

## II. DISCUSSION

Defendants have filed a motion to dismiss the indictment on the ground of outrageous government conduct. Defendants contend that their due process rights were violated by government overreaching. According to Defendants, the government engineered the criminal scheme – creating the fiction of the stash house, cocaine, and disgruntled courier – and ensnared Defendants, who were not already involved in any criminal activity, into participating in the fabricated enterprise. For the reasons discussed below, Defendants' motion is **DENIED**.[1]

The Ninth Circuit explains that "outrageous government conduct" is a claim that "government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." United States v. Holler, 411 F.3d 1061, 1065 (9th Cir. 2005) (quoting United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir. 1995)). To meet this "high standard," the governmental conduct "must be so grossly shocking and so outrageous as to violate the universal sense of justice." Id. at 1066 (quoting United States v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir. 1991)).

In addition to cases of extreme police brutality, law enforcement conduct becomes constitutionally unacceptable "where government agents engineer and direct the criminal enterprise from start to finish" or when "governmental conduct constitutes in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant." United States v. Bogart, 783 F.2d 1428, 1436 (9th Cir. 1986) (internal quotation marks and citation omitted), vacated in part on rehearing by United States v. Wingender, 790 F.2d 802 (9th Cir. 1986). In Greene v. United States, 454 F.2d 783 (9th Cir. 1971), the only Ninth Circuit case where the outrageous government conduct defense has been successfully raised, the Ninth Circuit reversed conspiracy and bootlegging convictions due to the extent of the government's involvement in creating and maintaining the criminal operations. The undercover agent approached defendants after their prior arrest on

---

[1] After Defendants filed their motion, the Superseding Indictment was returned. The Court construes the motion to dismiss as applying to the Superseding Indictment.

bootlegging charges, provided materials for the still, found an operator and location for the still, and supplied sugar at wholesale prices. The agent was also the still's sole customer. The government's involvement lasted over two-and-a-half years. In reversing the convictions, the Ninth Circuit reasoned:

> We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators. As pointed out in Sherman v. United States, supra, 356 U.S. at 372, 78 S.Ct. at 821, a certain amount of stealth and strategy "are necessary weapons in the arsenal of the police officer." But, although this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative. Under these circumstances, the Government's conduct rises to a level of "creative activity" (Sherman, supra, at 372, 78 S.Ct. at 821), substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined.

Greene, 454 F.2d at 787.

In this case, the government's conduct does not even approach the level of direct involvement that was found unconstitutional in Greene. Although the government created the fiction of the stash house, it appears that Matson recruited Wilson and Lewis and that Defendants were actively involved in planning the robbery. Defendants also brought along their own weapons, gloves, and masks. As far as the Court can tell, the government presented the opportunity of a criminal operation and found someone who was interested, but did not engage in the type of aggressive activity that would "shock the conscience."

Defendants rely on United States v. Bonanno, 852 F.2d 434 (9th Cir. 1988), to support their argument that the government's conduct was outrageous. In Bonanno, the Ninth Circuit stated that the government's conduct is permissible when:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

Id. at 437. Defendants argue that none of these factors are present in this case.

1       However, as pointed out in United States v. Simpson, 2010 WL 1611483 (D. Ariz. Apr.
2010), the Ninth Circuit has not stated that *if and only if* the five Bonanno factors are met, the
government's conduct is acceptable. "Rather , it appears the factors are guidelines that
provide a means to analyze the government's behavior." Id. at * 8. "Ultimately, every case
must be resolved on its own particular facts." Bogart, 783 F.2d at 1438.

      This case appears to involve a rather ordinary sting operation, similar to those that
have been deemed permissible by the Ninth Circuit. For example, in United States v. Citro,
842 F.2d 1149 (1988), the Las Vegas Police set up a sting operation to investigate local
merchants for possible collusion in a counterfeit credit card scheme. The police hired an
informant to act as a liaison to introduce undercover officers to merchants willing to accept
counterfeit cards. The informant became friends with the defendant Citro and raised the idea
of a counterfeit credit card scheme involving collusive merchants. Citro suggested he might
know some merchants who would be willing to accept counterfeit credit cards. The informant
told him that he had a partner (an undercover officer) who actually possessed the card. Citro
met the undercover officer who told him how the credit card scheme would work. Later, on
two occasions, Citro made arrangements with merchants who accepted the counterfeit credit
cards from the undercover officer. Citro was found guilty of conspiracy to use counterfeit
access devices and attempting to use counterfeit access devices.

      Citro brought a motion to dismiss the indictment based on outrageous government
conduct. The trial court denied the motion, and the Ninth Circuit affirmed. The Ninth Circuit
explained that the government's conduct did not rise anywhere near the level of Greene. Id.
at 1153. Although the government supplied the counterfeit credit cards and initially raised
the idea of a counterfeit credit card scheme, it did not create the criminal activity and its
conduct was not so egregious as to shock "the universal sense of justice." Id. at 1153.

      Similarly, in United States v. Luttrell, 889 F.2d 806 (9th Cir. 1989), amended in part
and vacated in part by 923 F.2d 764 (9th Cir. 1991), the Ninth Circuit rejected defendant
Luttrell's outrageous government conduct argument. In Luttrell, a government informant was
hired to solicit prospective clients for illegal credit card draft deals. The informant was a

former acquaintance of Dale Kegley, who had previously operated a business and possessed credit card drafts that had been returned from his bank. The informant got in touch with Kegley and told him that he could help him factor credit card drafts. An undercover agent, who claimed to be operating a business called "Aloha Imports," called Kegley to discuss the possibility of processing credit card drafts. Kegley indicated that he did have a number of drafts that were a "little bit old" and some that were invalid. The agent said that he could process the drafts and proposed a split of 60/40. The next day, Kegley met with the agent. Kegley also brought along Luttrell, who was introduced as his "business associate." The agent explained how the scheme would work, and suggested changing the name on the drafts as well as changing some amounts. Kegley did not object. It was agreed that Luttrell would collect the money from the transaction because Kegley was scheduled to be out of town. At the end of the meeting, Kegley and Luttrell gave the undercover agent nearly $1 million in credit card drafts.

The Ninth Circuit held that the government's actions did not violate Luttrell's due process rights. The Ninth Circuit explained that a government operation involving undercover agents posing as characters, delivering lines, and even using "props," is the type of government conduct that "is unencumbered by Greene as long as the government does not operate, for an extended period of time, an actual and illegal apparatus." 889 F.2d at 812. Upon rehearing en banc, the Ninth Circuit also held that there is no requirement under the due process clause that the government have "reasoned grounds" for investigating an individual. 923 F.2d at 764.

The sting operation in this case is similar to those in Citro and Luttrell. An informant fished for information regarding people who might be interested in a home-invasion robbery. Matson was put into contact with the undercover officer who played the role of a disgruntled courier and provided details about the fictional stash house and cocaine. Matson took the bait and brought in Wilson and Lewis to help carry out the crime. The government did not establish "an actual, complete, and long-functioning criminal apparatus," Luttrell, 889 F.2d at 812, nor did it engage in conduct that could be deemed egregious. The government may

use "artifice and strategem to ferret out criminal activity." <u>Sorrells v. United States</u>, 287 U.S. 435, 441 (1932). That is precisely what occurred here.

The District of Arizona denied a motion to dismiss for outrageous government conduct in a case with facts very similar to those in this case. In <u>United States v. Simpson</u>, 2010 WL 1611483 (D. Ariz. Apr. 20, 2010), an agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives posed as a disgruntled drug courier who wanted to rob a stash house. An informant working for the agent struck up a conversation with an individual named Curtis and asked Curtis if he knew anyone who would be interested in committing a robbery. Curtis gave the informant defendant Simpson's contact information. The informant met with Simpson who expressed interest in putting a crew together to commit the robbery. Simpson next met with the undercover agent. The undercover agent said that there might be up to 46 kilograms of cocaine in the stash house and that it was guarded by two armed men. Simpson then came up with a plan that involved the use of five men and firearms.

The District of Arizona held that the government permissibly used artifice and stratagem to ferret out criminal activity. The court explained:

> The government provided the opportunity to rob the stash house. The Defendants were the ones who decided to take action, organize themselves, and figure out a plan and the various details to rob the stash house. Providing an opportunity for criminal activity is far beneath the threshold for outrageous government conduct.

<u>Id.</u> at * 11. This Court agrees, and therefore denies Defendants' motion to dismiss for outrageous government conduct.

### III. CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss for outrageous government conduct is **DENIED**.

**IT IS SO ORDERED.**

DATED: February 10, 2012

_____
BARRY TED MOSKOWITZ, Chief Judge
United States District Court